Filed 12/23/25  P. v. Ince CA5

## <u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>PENNIE MARIE INCE,<br><br>    Defendant and Appellant. | F087197<br><br>(Super. Ct. No. PCF425784)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tulare County.  Robert Anthony Fultz, Judge.

Valerie G. Wass, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Julie A. Hokans and Robert Gezi, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant and appellant Pennie Marie Ince (defendant) was convicted by a jury of murdering her husband Randy I. (Randy)[1] while lying in wait. The jury also found in part that defendant personally used a firearm and inflicted great bodily injury (GBI) that resulted in death. The trial court sentenced defendant to life without the possibility of parole (LWOP) plus 25 years to life. On appeal, defendant contends that: (1) the court prejudicially erred by giving the jury an adoptive admission instruction when the criteria for an adoptive admission had not been met; (2) the jury's true finding on the lying-in-wait special circumstance was not supported by substantial evidence; and (3) if the lying-in-wait special circumstance is upheld, the court erred by imposing a $10,000 parole revocation fine. We affirm the judgment but conclude that the $10,000 parole revocation fine is an unauthorized sentence that must be stricken.

## PROCEDURAL BACKGROUND

On October 10, 2023, the Tulare County District Attorney filed an amended information that charged defendant with one count of murder (Pen. Code, § 187, subd. (a)),[2] with a special circumstance of lying in wait (§ 190.2, subd. (a)(15)). The information alleged as enhancements that defendant personally inflicted GBI resulting in death (§ 12022.53, subd. (d)), defendant personally used a firearm (§ 12022.5, subd. (a)), and the victim was particularly vulnerable.

Also on October 10, 2023, a jury trial commenced. The trial ended on October 18, 2023. The jury found defendant guilty of murder and found true the special circumstance of lying in wait as well as the three enhancements.

On November 15, 2023, the trial court sentenced defendant to a total term of LWOP for murder while lying in wait plus 25 years to life for the section 12022.53,

[1]   Because some witnesses share the same last initial, we refer to these witnesses and any other witnesses by their first name for consistency and in order to avoid confusion. No disrespect is intended.

[2]   Unless otherwise noted, all further statutory references are to the Penal Code.

subdivision (d) GBI enhancement.  A 10-year sentence for the section 12022.5, subdivision (a) personal use of a firearm enhancement was stayed pursuant to section 654.  Finally, a $10,000 parole revocation fine was imposed under section 1202.45, subdivision (a).  Defendant filed her notice of appeal the same day.

## FACTUAL BACKGROUND

*General Background*

In March 2022, defendant and Randy had been married for about four years.  Prior to their marriage, they had known each other for about six years.  Randy and defendant lived in Tulare and were a block away from Randy's best friend, Larry K. (Larry), and Randy's daughter, Rhonda I. (Rhonda).  Randy owned several pets, including a large pitbull dog who weighed between 75 and 100 pounds.  The pitbull loved Randy, always wanted to be near him, and was always excited when he came home.

*Events of March 6, 7, and 8, 2022*

On the morning of Sunday, March 6, 2022, Randy was away from home and finishing a painting job.  Defendant and Randy were planning to visit Randy's mother the next day in Gridley, which was about five hours away.  Rhonda stopped by the house around 9:00 a.m. to see if Randy would be going to church with her that morning.  Rhonda spoke with defendant, and defendant told Rhonda in part that Randy would not be going to church because he was working.  Rhonda left the house.

That afternoon, a neighbor's security camera recorded Randy returning home and parking his SUV just in front of the house; the video's timestamp read 1:08:26 p.m.  Randy was doing something in his SUV, and about 40 seconds elapsed before Randy got out of the SUV and opened the driveway gate.  Randy had to take off a chain around the driveway gate, which took a little bit of time to do.  Randy then went into the house.  A gunshot can be heard from a second security camera's audio recording; the camera's timestamp read 1:10:03 p.m.  Around 1:17 p.m., a security camera recorded defendant leaving her home, getting into Randy's SUV, and driving away.

3.

At about 1:19 p.m., Rhonda received a call from defendant. Defendant told Rhonda that she might want to call an ambulance for her dad and then hung up. Rhonda tried to call defendant back multiple times, but her calls went straight to voicemail. Rhonda stopped what she was doing and ran over to Randy's house.

Rhonda arrived at Randy's house but was unable to get inside. Rhonda tried knocking on the doors and windows and calling for Randy, but no one answered. Neighbors told Rhonda that Randy and defendant had left the house together. Rhonda was confused by what the neighbors told her in light of defendant's call, but she ultimately decided to walk back home.

Later, Rhonda unsuccessfully tried to call Randy several times. About two hours after she left Randy's house, Rhonda decided to go back. Rhonda knocked on Randy's door, yelled for Randy, and called Randy's cellphone. Rhonda heard Randy's cellphone ringing from inside the house. Rhonda then called Larry for help. When Larry arrived, he was able to pick the lock on the front door. Larry went inside while Rhonda stayed outside. Larry saw Randy's legs lying on the ground and saw that Randy had been shot in the head. Larry exclaimed, " 'Oh my God, Randy' " and " '[S]he shot him.' " The pitbull was lying on top of Randy. Larry saw blood on the ground and was unable to detect a pulse on Randy. Larry also saw a shotgun about 10 feet away. Rhonda called law enforcement, who responded to the scene.

Officers from the Tulare Police Department responded first. The officers took a statement from Rhonda. In part, Rhonda told the officers that defendant had told her at some point during the morning that, "I will kill your dad and I will kill myself."

Crime scene investigation officers also arrived on scene to collect evidence, take photographs, and document the crime scene. Randy's body was located on the floor in the front door entrance, his head was next to a wall, and a curtain covered part of his head. There was a substantial shotgun wound to the upper left quadrant of Randy's head. No other wounds were apparent. Blood spatter and other biological material from Randy

4.

were found on the walls, ceiling, furniture, door frame, and door. The location of the body and the "high velocity" blood spatter pattern indicated that the shotgun was fired with an upward trajectory and from close range, within five feet.

A shotgun was found on the ground near the entry of a second living room.[3] The front door can be seen from the entrance of the second living room. A forensic expert opined that "everything occurred pretty much right there at the front door area," and that Randy was shot while the screen door was closed and the front door open. Further, based on a schematic drawing of defendant's home, it appears that a person standing at the location where the shotgun was found would also have a view of the interior garage door. The shotgun had been loaded to full capacity; it had an expended shell in the chamber and two live rounds in the ammunition tube. The shotgun had a metal trigger and an "obvious amount of force or pressure" on the trigger was needed for the weapon to be fired. The shotgun's safety was off.

Away from the house, a citizen contacted the Tulare Police Department about two license plates that had been found around 11 miles away from Randy's house. A records check revealed that the owner associated with the license plates was Randy. Further, Tulare County Sheriff's personnel obtained video footage of defendant withdrawing money from an ATM in Hanford around 5:10 p.m. Defendant used Randy's debit card to withdraw money from his bank account.

Tulare County Sheriff's personnel began to "ping" defendant's cellphone around 6:05 p.m. A series of pings indicated that defendant's cellphone was in Fresno. Law enforcement searched for defendant's cellphone using location information from the "pinging" process. Defendant's cellphone was eventually found in a parking lot in Fresno.

---

[3] The front door opened into a first living room, and the first and second living rooms were connected by an open space (no door).

The Tulare County Sheriff's Department received information from the Fresno Police Department that Randy's SUV had been located. The SUV was located at a bar near the parking lot where defendant's cellphone was found. The SUV had license plates different from the plates that had been officially issued to it.

Tulare County Sheriff's deputies obtained security videos from the bar for the evening of March 6. The deputies reviewed footage from the bar's eight internal and external security cameras. For purposes of this appeal, the videos captured events from approximately 6:47 p.m. to 7:31 p.m. In relevant part, the videos show defendant arriving at the bar in Randy's SUV. Defendant is seen walking into the bar wearing a green shirt, blue jeans, and boots and then ordering a drink. Defendant then leaves the bar and returns to the SUV, where she retrieves clothing. Defendant then reenters the bar with the clothing in hand, goes to the restroom, and comes back to the bar wearing different clothing (a blue shirt and dark pants). For 20 minutes, videos show defendant interacting with bar patrons and eating a slice of pizza. Defendant is then seen walking to the front of the bar, walking back to where she had been seated, taking her purse, and then exiting out the back of the bar. Fresno police officers are then seen entering the bar approximately two minutes later.

Law enforcement officers searched for defendant but did not find her. However, officers found a garbage bag in the bar's dumpster. The garbage bag contained a green blouse, blue jeans, and boots (consistent with the clothes that defendant was wearing when she first entered the bar) and two price tags for used clothing.

Late in the afternoon of March 8, Fresno law enforcement determined that defendant was staying in a motel about three miles from the bar. Defendant was taken into custody at the motel without incident. The Fresno officers turned defendant over to Tulare County Sheriff's deputies, who transported her to a sheriff's substation. Prior to reaching the substation, defendant made statements to the deputies, such as a taxi driver had taken her cellphone, but did not mention the shotgun accidently discharging.

*Police Interview of Defendant*

At the substation, defendant was interviewed by Tulare County Sheriff's Detective Jose Melendez and a federal law enforcement officer, David Gutierrez. The interview was played to the jury, and the jury was provided with a transcript of the interview. In part, defendant stated on March 6, 2022, she withdrew about $800 of her and Randy's money after Randy was shot. Defendant admitted to changing license plates on Randy's SUV because she was scared. Defendant stated she intended to drive to a store on March 6, but ended up at the bar in Fresno. At the bar, she bought three people drinks but denied that she was celebrating anything because it was the worst day of her life. Defendant changed her clothes because the weather was cold and the clothes she was wearing were not for cold weather. Defendant said that she saw the police looking at her vehicle and then she "bailed" out the bar's back door. Defendant explained she went down an alley, jumped a fence, and eventually tried to sleep outside in play equipment at a nearby daycare center. In the morning, defendant went to a gas station and got a taxi. Defendant said the taxi driver offered to let her warm up and freshen up at his apartment. Throughout the interview, defendant repeatedly stated that she wanted to see a doctor, that she was not feeling well, and she believed that she was under the influence of something that the taxi driver had put in her food.[4]

Defendant eventually spoke to the detectives about Randy's death. Defendant attempted to tell the detectives that Randy had shot two bullets at her from a pistol and tried to kill her the night before. However, defendant then explained that she saw a shotgun in the garage, even though the shotgun was supposed to be in a case in one of the bedrooms. Defendant did not know why the shotgun was in the garage, but she was going to take it from the garage and put it back in the bedroom. As she was walking from

---

[4]    At the end of the interview, defendant's blood was tested. The results of the blood test revealed effective levels of codeine and amphetamine and potentially toxic levels of methamphetamine and morphine.

the garage to the bedroom, Randy came into the house through the front door. Randy's pitbull got very excited to see Randy and then ran towards him. As the dog ran towards Randy, it ran into defendant and caused the shotgun to go off and hit Randy. Defendant insisted multiple times that she did not pull the trigger, that the dog ran into her, the shotgun fired, and Randy's death was an unintentional accident. Defendant thought the shotgun blast hit Randy in the head. Defendant said she was scared, did not know what to do, could not believe what had just happened, went "crazy," and then "bailed." Defendant stated she "couldn't stay at [her] house seeing him like that," so she drove to Farmersville, Hanford, and Fresno. Defendant said that while she was driving, she called Rhonda and told her to get an ambulance for her dad.

Defendant indicated Randy got her into a relationship that she described as "the better it feels the worse it hurts." When asked more about the phrase and about her relationship with Randy, defendant explained that initially, she did not want a boyfriend and that their relationship was purely sexual. She indicated she "didn't want to love anybody" and was reluctant to be in a relationship with Randy, but began spending more time with him. Eventually, she told Randy that she may be able to have a relationship if he answered a question. When Melendez asked what the question was, defendant responded: "The question was, answer the better it feels the worse it hurts." In response to her question, Randy answered, "[W]e die together."

Defendant admitted that they had ups and downs, but she was not worried about Randy cheating on her. Defendant explained that she got upset with Randy for working so much while retired and not considering her feelings. However, defendant denied that Randy treated her badly and denied that he deserved to get shot.

On the morning of Randy's death, defendant said, she told Rhonda that he would not be going to church because he was working. Defendant denied telling Rhonda that "[y]ou better call your dad and tell him goodbye soon." When Melendez asked why defendant told Rhonda that she would kill Randy and herself before they split up,

8.

defendant responded, "That had nothing to do with what happened." She admitted that while she remembered telling Rhonda that, she had told Rhonda this before and it was an irrelevant statement that had "nothing to do with" the dog knocking her over.

*Trial Testimony of Rhonda*

At trial, Rhonda testified that she normally would go to church with Randy on Sundays. When Randy did not stop by to pick her up for church on March 6, she walked over to Randy's house. Randy was not home, but defendant was, and Rhonda spoke to defendant. Defendant told Rhonda that Randy was working and trying to finish a painting job because they wanted to go to Randy's mother's house in Gridley the next day. Rhonda thought that defendant looked mad, and when she asked defendant what was going on, Rhonda believed defendant insinuated that Randy was cheating on her because he was getting home late from work and had left early that morning. Rhonda said that she did not think Randy was cheating on defendant, but that if they were so miserable together, why did they not just part ways. Defendant replied that would not happen (leaving Randy), and that she would kill Randy and then kill herself. Rhonda testified, "She told me that basically if she couldn't have my Dad, nobody would," and that she had never heard defendant says things like that before. Rhonda realized that talking further would not help anything and started to go. As defendant was shutting the door, defendant told Rhonda: " 'You might want to call your dad and tell him goodbye soon.' " Defendant then shut the door. Rhonda thought defendant's statement was unusual, and that it did not relate to the Gridley trip. Although she felt defendant's statement was more of a threat, Rhonda decided not to tell Randy because she knew he was trying to finish a project, and she had heard from other people that defendant had made threats to Randy in the past.

The next time that Rhonda heard from defendant was at 1:19 p.m., when defendant called Rhonda's cellphone. Defendant told Rhonda: " 'You might want to call the ambulance for your dad.' " It sounded like defendant was driving while she spoke to

Rhonda. Defendant then hung up, and Rhonda unsuccessfully attempted to call defendant back multiple times. Rhonda did not speak with defendant again.

*Trial Testimony of Larry*

At trial, Larry testified in part that he was Randy's best friend, saw Randy and defendant almost every day, and lived about 100 yards away from Randy "as the crow flies." Larry testified that Randy and defendant's relationship was "[a] little good and mostly strained," and that they did nothing but argue the last year or two. Larry never saw any physical fighting. Larry recalled talking to Randy about defendant's shotgun approximately a year before Randy was shot. Larry testified that Randy wanted Larry to remove the firing pin from defendant's shotgun because Randy was afraid that defendant would shoot him (Randy). Larry testified that Randy had told him that defendant had previously shot at him with a .22 caliber firearm, which caused Randy to be afraid. Randy wanted Larry to remove the shotgun's firing pin without defendant knowing about it. Larry testified he was unable to remove the firing pin because defendant was usually around, and although he had removed firing pins from firearms before, he was unfamiliar with that model of shotgun and needed to figure out the process. Larry testified that they never got around to removing the firing pin, and Randy did not again ask Larry to remove the firing pin. Larry acknowledged that, about a year before Randy's death, Randy one time jokingly said that he was afraid that he would have to kill defendant first, but that Randy was not joking when he said, on more than one occasion, that defendant might try to kill him.

*Trial Testimony of Defendant*

At trial, defendant testified in part that she was upset with Randy on the morning of March 6, because she wanted to leave to go to Gridley instead of waiting for Randy to complete a job. Defendant acknowledged speaking to Rhonda that morning. Defendant said that she told Rhonda that she was upset that Randy was working and that they should have been traveling already. Defendant testified that she told Rhonda the "same joke we

10.

always have, that we've had for several years, that I would kill him before he leaves …."

Defendant explained that the joke was in relation to her and Randy's lifestyle as "swingers" and people who engage in "S&M." Specifically, defendant explained that her joke about killing Randy before the relationship would end involved Randy having a heart attack while having sex with defendant and another person. However, defendant denied ever telling Rhonda that defendant would also kill herself. Defendant stated that this was a common running joke that would be said maybe once a week to other people for about five years. Defendant also admitted telling Rhonda to call her father to say goodbye, but she said it because Rhonda would not see Randy before he left for the Gridley trip.

After Rhonda left, defendant testified that she went back into the house and continued to pack. Defendant testified that she called Randy one time to ask when he would be back home. Defendant testified that Randy said he would be working the entire day and into the night, until around 10:00 p.m. Defendant testified that as she was packing, she went into the garage and noticed a shotgun sitting out in the open. Defendant testified that the shotgun was Randy's, but that it belonged in a case inside the house. Defendant testified there was no place for her to sit in the garage, so she took the shotgun inside to see if it was loaded and to put it away. Defendant explained that she was going to see if the shotgun was loaded because she was not the one who took the shotgun outside. Defendant went inside and sat on the corner of a wicker basket. Defendant was facing towards the front door, and her left hand was above the trigger guard. As defendant was getting ready to see if the shotgun was loaded, Randy's pitbull came running in from the garage. Defendant had not heard anything before the pitbull came running in. As the pitbull was running from the garage, it knocked into defendant. Defendant was trying to get control of the shotgun because she did not want the gun to drop and shoot the dog. Defendant testified that she stood up and, as she was trying to pull the shotgun back towards her and regain control, the shotgun discharged, and then

11.

Randy hit the ground. Defendant had not noticed Randy coming into the house and did not know he was home. Defendant testified that shooting Randy was an accident and not intentional. Defendant testified that she did not point the gun at Randy, did not plan to kill him, did not wait to shoot him, and did not want to kill him.

Defendant testified she could not believe what had happened and panicked. Defendant saw Randy's body and then unsuccessfully tried to commit suicide with the shotgun, but the gun "was too long" to place in her mouth and pull the trigger. Defendant explained she was in shock, traumatized, and did not know what to do. She did not try to give Randy any aid because "[t]here was no aid to give." Later, when defendant was questioned about why she called Rhonda a minute or two after Randy was shot, she said she had called Rhonda to tell her to call an ambulance for her dad. Defendant testified she thought "there might be a chance, maybe he had a breath in him if help comes" but that she "couldn't be the one to sit there." After she found her keys, she got into Randy's SUV and drove away.[5]

Defendant realized that she had her two dogs with her and decided to take them to her boss's house. As she was driving, defendant testified that she tried to think of ways to commit suicide and eventually decided that she would overdose. Defendant explained that she and Randy had a pact and had agreed that they would die together, because the longer you are with someone, the more it hurts when they are gone Once she reached her boss's house, defendant gave her dogs to her boss and told him that Randy was dead and she would not be coming back. While her boss was putting the dogs inside his house, defendant stole his license plates and placed them on her SUV because she did not want to be prevented from committing suicide and fulfilling her "oath" to Randy.

---

[5] Defendant testified that her own car could not be driven.

12.

Somehow, defendant drove to Hanford and withdrew about $800 from an ATM so that she could buy fentanyl and overdose. Defendant decided to go to Fresno to get fentanyl because it was a larger city with more crime and available drugs.

Once in Fresno, defendant purchased some new clothes because she felt "contaminated." Defendant bought the clothes at a thrift store and then drove across the street to a bar. After defendant went inside the bar and changed clothes, defendant started asking people if they knew where to get fentanyl. Eventually defendant saw the Fresno police looking at her SUV in the parking lot. Defendant went out the bar's back door because she wanted to avoid the police and commit suicide. Defendant jumped several fences and slept inside play equipment. Defendant lost her cellphone while getting over one of the fences.

Defendant testified that she woke early the next morning, went to a gas station, and asked the gas station attendant to get a taxi for her. A taxi driver picked her up and took her to a store, where she got a new phone. Defendant asked the taxi driver if he knew where to get fentanyl. The taxi driver told defendant he could get heroin, but not fentanyl, and offered to let defendant stay at his house instead of going to a motel. Defendant went to the taxi driver's house, freshened up, and slept on the couch while the taxi driver finished his shift. Defendant could not remember very much about staying at the taxi driver's home, but she remembered giving him $900 to get heroin. The taxi driver returned with food and told defendant that he had put the drugs in the food. Defendant testified that she ate all the food and then began to feel extremely high. Defendant testified that the taxi driver did not want defendant to die at his home, so he took defendant to a motel. Defendant did not recall how she ended up in the motel room.

Defendant had no memory or recollection of the police interview that was played to the jury. Defendant testified that she vomited several times, was under the influence of whatever was in the food, and thought she was going to die.

13.

*Testimony of Kimberly G.*

In relevant part, Kimberly G. testified that she had known defendant for 20 years and knew Randy after he and defendant were married. Kimberly also knew of Randy's pitbull and testified that it would go "crazy" and jump around when Randy came home. Kimberly was friends with both Randy and defendant and acknowledged having a sexual relationship with both. Kimberly testified to an instance about five to seven years before trial when Randy thought he was having a heart attack while Kimberly, Randy, and defendant were all having sex together. Randy eventually calmed down and was able to catch his breath. In connection with the perceived heart attack, Kimberly. testified that Randy said Kimberly and defendant "would be the death of him" or they would kill him. Randy made such a statement several times, the most recent time being about a month before his death. Kimberly testified that Randy's statement was a joke among the three of them.

*Defendant's Neighbor*

One of defendant's neighbors, Jaime R., testified at trial. In relevant part, Jaime testified he was gardening in his yard on March 6, around 1:00 p.m. At that time, Jaime heard a firearm discharge. Jaime "want[ed] to say" he heard two shots. Prior to hearing the gunshot, Jaime did not hear any loud noises or "arguing or anything."

## DISCUSSION

## I. PROPRIETY OF AN ADOPTIVE ADMISSION INSTRUCTION

### A. Parties' Arguments

Defendant argues that the trial court erred by giving a jury instruction relating to adoptive admissions. Defendant argues that the detective's statement during the police interview, in which defendant did not disagree with her purported statement to Rhonda that defendant would kill Randy and then herself rather than separate, does not meet the standards for an adoptive admission because defendant did not adopt the statement's literal meaning. Defendant argues that the prosecutor was allowed to argue that

14.

defendant made an adoptive admission that she intended to kill Randy and thus, had the intent to kill. Defendant argues that this relieved the prosecution of the burden to prove each element of murder beyond a reasonable doubt and that the prosecutor's emphasis on the statement to Rhonda violated her state and federal due process rights.

The People contend the trial court correctly gave the adoptive admission instruction because the requirements of an adoptive admission were satisfied. The People argue that during the police interview, Melendez directly confronted defendant with a statement attributed to her by Rhonda (that defendant would kill Randy and herself before there would be a breakup) and defendant did not deny making the statement or the truth of the statement. Alternatively, the People argue that giving the adoptive admission instruction was harmless.

## B.     Additional Background

### March 8, 2022 Police Interview

During defendant's interview on March 8, the following exchange occurred:

> "[Melendez]: Okay, so when Rhonda told us that when she told you that morning, Sunday, when you … she went over there to ask if you guys were going to church, but Randall was busy working, she recommended you guys split up because she could tell you were upset and going through some difficult times. When she said you should split up you told her no there won't be any splitting up. He's not going anywhere, and neither am I. I'll kill him and myself before that happens. Why did you tell her that?

> "[Defendant]: That had nothing to do with what happened.

> "[Melendez]: No? But you remember telling her though what I'm getting at?

> "[Defendant]: Yeah.

> "[Melendez]: Okay.

> "[Defendant]: But that … that … that is not … it's irrelevant because that has nothing to do with this dog knocking me over.

> "[Melendez]: Okay.

15.

"[Gutierrez]: (UNINTELLIGIBLE) I mean you're … you're telling his daughter this, but now his …

"[Defendant]: And I've … and I've said it before to his daughter. Okay?"

*Jury Instruction Proceeding*

Prior to instructing the jury, the parties argued about the propriety of an adoptive admission instruction. The prosecutor expressly identified the adoptive admission as the portion of the police interview where defendant did not deny that she told Rhonda that she (defendant) would kill Randy and herself before there would be a breakup. The prosecutor identified no other examples of an adoptive admission.

The trial court eventually found that an adoptive admission instruction was appropriate. The court found detective Melendez's statement from Rhonda about defendant killing Randy and then herself before they broke up was one that defendant "would normally have denied in the normal course of the interview but did not, which is the definition of an adoptive admission." After hearing an objection on the point by defense counsel, the court again explained: "They're telling her that and her not denying is offered for the truth that was a statement that Rhonda made because she didn't deny it, that's what an adoptive admission is."

*Jury Instructions*

In relevant part, the trial court gave CALCRIM Instruction No. 357 (Instruction 357). Instruction 357 read:

"If you conclude that someone made a statement outside of court that tended to connect the defendant with the commission of the crime and the defendant did not deny it, you must decide whether each of the following is true:

1. The statement was to the defendant or made in her presence;

2. The defendant heard and understood the statement;

3. The defendant would under all the circumstances naturally have denied the statement if she thought it was not true;

16.

AND

4.  The defendant could have denied it but did not.

"If you decide that all of the requirements have been met, you may conclude that the defendant admitted the statement was true.

"If you decide that any of these requirements have not been met, you must not consider either the statement or the defendant's response for any purpose."

The trial court also gave the jury CALCRIM Instruction No. 200 (Instruction 200), which described the duties of the judge and jury. In relevant part, Instruction 200 provided:

"Some of these instructions may not apply, depending on your findings about the facts of the case. Do not assume just because I give a particular instruction that I am suggesting anything about the facts. After you have decided what the facts are, follow the instructions that do apply to the facts as you find them."

*Closing Argument*

On several occasions during closing argument and rebuttal, the prosecutor noted defendant's purported statement to Rhonda that defendant would kill Randy and then herself before there would be a breakup. However, the prosecutor only mentioned adoptive admissions one time, and that was during rebuttal. With respect to adoptive admissions, the prosecutor told the jury:

"Okay. So one of the instructions that you have is called adoptive admissions. Basically says if someone says something to the defendant and she could have denied it if it wasn't true and she would have expected to have denied it if it wasn't true, then you can consider that statement to be true. They're confronting her right there with this statement that Rhonda made about her saying to Rhonda that morning there won't be any splitting up. 'I'll kill him and myself before that happens,' and she doesn't deny that she makes it.

"So you can consider that as being a true statement that the defendant has adopted [as] true. In fact, they follow up the very next set of questions, but you remember saying it and she agrees, yes. She's contradicting the detectives if they're saying that the garage or that the gun

17.

belongs in one place and not the other, she not afraid to contradict them if what they're saying is inaccurate, but she doesn't there because what she said to Rhonda is basically what Rhonda testified to is basically what the detectives are saying to they are there, there wasn't going to be any splitting up. She would kill herself and him before that was allowed to happen." [¶] … [¶]

"That's an example of the kind of behavior that she's exhibiting during this interview. If she's being told someone said something, she's going to contradict it. She can't help herself. She's going to say, [']no, that's not what happened.['] So when she's saying earlier when she's being confronted with what Rhonda said about [']I'm going to kill him. There's no one else, there's no splitting up.['] The fact that she doesn't contradict that, very good evidence that that's pretty much exactly what she said, or at least the intentions behind it were exactly what she meant."

## C. Legal Standards

### 1. Adoptive Admission Hearsay Exception

"Hearsay is an out-of-court statement offered to prove the truth of its content." (*People v. Valencia* (2021) 11 Cal.5th 818, 831; see also Evid. Code, § 1200.) "Hearsay is inadmissible unless it falls under [a statutory] exception." (*People v. Ng* (2022) 13 Cal.5th 448, 539.) "A trial court's ruling on the admissibility of evidence, including 'on the hearsay nature of the evidence in question,' is reviewed for an abuse of discretion." (*People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 766; see *People v. Charles* (2015) 61 Cal.4th 308, 322 (*Charles*).) However, whether the necessary foundational findings of fact for a hearsay exception have been established is reviewed for substantial evidence. (*People v. Caro* (2019) 7 Cal.5th 463, 503; *Charles*, at p. 322.)

One exception to the hearsay rule is an adoptive admission. (Evid. Code, § 1221; *Charles*, *supra*, 61 Cal.4th at p. 323; *People v. Chism* (2014) 58 Cal.4th 1266, 1297.) "Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if the statement is one of which the party, with knowledge of the content thereof, has by words or other conduct manifested his adoption or his belief in its truth." (Evid. Code, § 1221; *People v. Dalton* (2019) 7 Cal.5th 166, 229.) "The analytical basis for this

18.

exception is that the adopting party makes the statement his own by admitting its truth. The statement or conduct of the adopting party thus expresses the same statement made by the declarant." (*People v. Castille* (2005) 129 Cal.App.4th 863, 876.) That is, section 1221 "contemplates either explicit acceptance of another's statement or acquiescence in its truth by silence or equivocal or evasive conduct." (*People v. Combs* (2004) 34 Cal.4th 821, 843.) Once a defendant has adopted the statements of another, the statements become her own admissions; the defendant herself is in effect the declarant and the witness is the defendant herself, not the actual declarant. (*People v. Jennings* (2010) 50 Cal.4th 616, 661–662.) " 'In determining whether a statement is admissible as an adoptive admission, a trial court must first decide whether there is evidence sufficient to sustain a finding that: (a) the defendant heard and understood the statement under circumstances that normally would call for a response; and (b) by words or conduct, the defendant adopted the statement as true.' " (*Dalton*, at p. 229; *Charles*, at pp. 322–323.) Stated differently, the two elements of an adoptive admission are: (1) the defendant must have knowledge of the content of another's hearsay statement, and (2) with knowledge of the other's statement, the defendant must use words or conduct that indicates her adoption of or belief in the truth of the other's hearsay statement. (*Combs*, at p. 843; *People v. Silva* (1988) 45 Cal.3d 604, 623.) If the defendant heard the statement in question, a defendant's silence or an evasive or equivocal response may be sufficient to show the defendant's adoption of the statement. (*Chism*, at p. 1297; *Combs*, at p. 843; *People v. Fauber* (1992) 2 Cal.4th 792, 852.) If the requisite foundational facts are met, " 'whether [the] defendant's conduct actually constituted an adoptive admission becomes a question for the jury to decide.' " (*People v. Geier* (2007) 41 Cal.4th 555, 590.)

### 2. Inapplicable Jury Instructions

"It is error to give an instruction which, while correctly stating a principle of law, has no application to the facts of the case." (*People v. Guiton* (1993) 4 Cal.4th 1116, 1129 (*Guiton*); see *People v. Cross* (2008) 45 Cal.4th 58, 67.) "Nonetheless, giving an irrelevant or inapplicable instruction is generally ' "only a technical error which does not constitute grounds for reversal." ' " (*Cross*, at p. 67.) If a jury is provided with an inapplicable and factually unsupported instruction, reversal is not required and the judgment will be affirmed if " 'a valid ground for the verdict remains, absent an affirmative indication in the record that the verdict actually did rest on the inadequate ground.' " (*People v. Mumin* (2023) 15 Cal.5th 176, 207; see *People v. Rivera* (2019) 7 Cal.5th 306, 329.) That is, giving an "instruction on an unsupported theory is prejudicial only if that theory became the sole basis of the verdict of guilt; if the jury based its verdict on the valid ground, or on both the valid and the invalid ground, there would be no prejudice, for there would be a valid basis for the verdict.' " (*Guiton*, at p. 1130; see also *People v. Canizales* (2019) 7 Cal.5th 591, 612–613.) Therefore, appellate courts will affirm a judgment "unless a review of the entire record affirmatively demonstrates a reasonable probability that the jury in fact found the defendant guilty solely on the [factually] unsupported theory." (*Guiton*, at p. 1130; see also *Rivera*, at p. 329.)

### D. Analysis

#### 1. Propriety of Instruction 357

The parties have identified only one statement as a potential adoptive admission. Specifically, the parties have identified the portion of the police interview in which the detectives asked about Rhonda's statement that defendant said she would kill Randy and herself before there would be any splitting up or breaking up. Based on the parties' briefing, we will confine our analysis of the adoptive admission instruction to this single statement/question by the detectives during the police interview (the Statement). For purpose of clarity, neither Rhonda's trial testimony before the jury that defendant said she

20.

would kill Randy and then herself before a breakup would occur, nor defendant's trial testimony that she would kill Randy before he left her, are included in a reference to "the Statement." With this clarification, we agree with defendant that the trial court committed error by giving Instruction 357.

The reason for our conclusion is relatively straightforward. An adoptive admission is the hearsay statement of a third party that is adopted by a defendant. (*Combs*, *supra*, 34 Cal.4th at p. 842–843; *Silva*, *supra*, 45 Cal.3d at p. 623; *Castille*, *supra*, 129 Cal.App.4th at p. 876.) In this case, the Statement is not the hearsay statement of a third party because the Statement was not made first by either the detectives or Rhonda and then adopted by defendant. Instead, the Statement is the defendant's actual words. The detectives simply prefaced the Statement with an explanation that they learned about defendant's actual words through Rhonda and then asked defendant why defendant herself would say such a thing. Defendant admitted to the detectives that she did in fact tell Rhonda that she would kill Randy and then herself before there would be a breakup. Thus, defendant did not expressly adopt any statements by Rhonda or by the detectives, rather she confirmed her own words that she had previously spoken to Rhonda. In actuality, the Statement is and has always ever been defendant's own words. Because the Statement has never been a hearsay statement by a third party that was adopted by defendant, the adoptive admission exception has no application, and Instruction 357 should not have been given. (*Chism*, *supra*, 58 Cal.4th at pp. 1297–1298 [finding error by instructing the jury on adoptive admissions when the requirements for an adoptive admission were not established]; *Guiton*, *supra*, 4 Cal.4th at p. 1129 [holding that it is error to give an inapplicable jury instruction].)

### 2. Harmlessness of Giving Instruction 357

Having found the trial court erred by giving Instruction 357, the question becomes one of harm. (*Guiton*, *supra*, 4 Cal.4th at p. 1130.) After review, we are convinced that

giving Instruction 357 was harmless because the record does not affirmatively show a reasonable probability that the verdict was based only on Instruction 357. (*Ibid*.)

First, the Statement, Rhonda's related testimony, and defendant's related testimony were each properly admitted into evidence and considered by the jury for all purposes, irrespective of the adoptive admission exception. Evidence Code section 1220 (section 1220) provides that "[e]vidence of a statement is not made inadmissible by the hearsay rule when offered against the declarant in an action to which he is a party ...." (§ 1220; *Dalton*, *supra*, 7 Cal.5th at p. 212.) Here, the detectives confronted defendant with her own words (based on what they had learned from Rhonda) during the police interview. Further, Rhonda testified before the jury that defendant had said to her that defendant would kill Randy and then herself before a breakup would occur. Finally, defendant admitted to the detectives that she had said the substance of the Statement to Rhonda, and admitted to the jury that she told Rhonda that she would kill Randy before breaking up. Therefore, evidence regarding the Statement and the related testimony from Rhonda and defendant regarding the substance of the Statement were all admissible as admissions of a party under section 1220. (*Charles*, *supra*, 61 Cal.4th at pp. 323–324; *People v. Guerra* (2006) 37 Cal.4th 1067, 1123; *People v. Carpenter* (1999) 21 Cal.4th 1016, 1049.) The jury as the finder of fact was entitled to consider the Statement and related testimony regarding the substance of the Statement for all relevant purposes.[6] (*White v. Merrill* (1889) 82 Cal.14, 16 [evidence admitted without limitation may be considered for all purposes within the issues of the case]; *People v. Font* (1995) 35

---

[6] The jury as the trier of fact was also entitled to consider and resolve defendant's testimony about what she may have meant by saying that she would kill Randy before a breakup would occur, since defendant told the detectives the Statement was irrelevant and explained to the jury that she was referring to an ongoing joke about heart attacks and group sex. (See *People v. Alvarez* (2025) 18 Cal.5th 387, 465 [noting that the "jury was entitled to weigh the evidence and draw its own conclusions"]; *People v. Ware* (2022) 14 Cal.5th 151, 167 [noting that it is the exclusive province of the jury to determine the credibility of a witness.]).

Cal.App.4th 50, 54–55.) Therefore, because there were three different admissions of a party by defendant that she would kill Randy before breaking up, if the Statement is excluded and not considered, Rhonda's trial testimony that defendant said she would kill Randy and then herself before a breakup would occur, and defendant's trial testimony that she would kill Randy before he left her would still remain and could be considered and used for the same purposes as the Statement. (*Guiton*, *supra*, 4 Cal.4th at pp. 1129–1130.)

Second, viewed in the light most favorable to the verdict (*People v. Boyce* (2014) 59 Cal.4th 672, 691 (*Boyce*)), other evidence besides the Statement and the substance of the Statement indicate that defendant intentionally killed Randy. Larry's testimony shows that Randy harbored a fear that defendant would shoot him with a shotgun, and defendant told Rhonda that she should say goodbye to her father soon, which Rhonda took as a threat. Consistent with Randy's purported fear and Rhonda's perceived threat, the surveillance videos show that Randy was shot by defendant soon after entering the front door. Further, after defendant shot Randy, defendant's actions indicate that she was aware of her own guilt for Randy's murder. (See *People v. Pettigrew* (2021) 62 Cal.App.5th 477, 497–498 [noting that flight and other postcrime conduct may be relevant and admissible to show consciousness of guilt].) Specifically, defendant admitted that she did not render aid, call for paramedics or contact the police, but fled as soon as she could find her keys. While fleeing, defendant stole and changed license plates and ultimately drove to Fresno. Defendant obtained cash, went to a bar, changed clothes, ran out the back of the bar to avoid Fresno police, and then threw her cellphone over a fence while running away. (See *id*.) Collectively, these considerations constitute substantial evidence that defendant intended to kill Randy with the shotgun. (*Boyce*, at p. 691; see *Guiton*, *supra*, 4 Cal.4th at pp. 1129–1130.)

Third, the language of Instruction 357 itself, as well as the language of Instruction 200, operated to negate any influence that Instruction 357 could have

otherwise had. Instruction 357 informed the jury that adoptive admissions could apply if "someone made a statement outside of court … and the defendant did not deny it." Instruction 357 also warned the jury that, before it could conclude that defendant admitted a statement was true through an adoptive admission, the jury was required to find that "[t]he statement was made to the defendant or made in her presence," and that the "defendant could have denied [the statement] but did not." As explained above, there was no statement made by "someone"/a third party; there was only a statement spoken by defendant as reported by Rhonda. That the detectives repeated defendant's own words back to her is not the same as a third party uttering the third party's own words and then defendant remaining silent. Therefore, the first requirement under Instruction 357 was not met. Because the first requirement under Instruction 357 was not met, Instruction 357 directed the jury not to consider the Statement or defendant's response. Similarly, Instruction 200 instructed the jury to determine the facts and only apply the instructions that were consistent with the facts found by the jury. Again, because the first requirement of Instruction 357 was not factually supported, Instruction 200 required the jury to disregard Instruction 357. (*Chism*, *supra*, 58 Cal.4th at pp. 1298–1299 [finding no harm from an improperly given adoptive admission instruction where insufficient facts supported a finding that an adoptive admission occurred and a separate instruction instructed the jury not to consider insufficiently supported instructions].) Reviewing courts presume that jurors understand, follow, and apply the instructions to the facts of the case before them. (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1229; see also *People v. Buenrostro* (2018) 6 Cal.5th 367, 431; *Chism*, at p. 1299.) Therefore, we presume through operation of Instructions 200 and 357 that the jury did not apply or consider Instruction 357. (*Hajek and Vo*, at p. 1229; *Chism*, at pp. 1298–1299.)

Defendant argues that the prosecutor relied heavily on the Statement and Instruction 357. We can agree that the prosecutor's closing argument and rebuttal referenced the substance of the Statement multiple times, often by referencing Rhonda's

24.

testimony. However, as an admission of a party, the prosector could properly highlight Rhonda's testimony to the jury and the prosecutor only mentioned Instruction 357/adoptive admissions one time. Specifically, the prosecutor said the detectives confronted defendant with Rhonda's report of what defendant had said. The prosecutor then stated that defendant did not deny saying the statement or contradict the detectives, so the jury could conclude that it was true that defendant had made the exact statement to Rhonda. However, there was no need for the jury to rely on Instruction 357 to conclude that it was true that defendant said the Statement or the substance of the Statement to Rhonda, or even that defendant meant what she said to Rhonda. In addition to Rhonda's testimony, defendant admitted to the officers during the interview that she had made the substance of the Statement to Rhonda, and expressly testified she told Rhonda that she (defendant) would kill Randy before a breakup would occur. Anything that Instruction 357 may have permitted the jury to conclude regarding the Statement could have also been surmised by the jury from Rhonda's testimony and defendant's own responses to the detectives and trial testimony, which were not the subject of Instruction 357. Given Rhonda's testimony and defendant's testimony, as well as the inapplicability of Instruction 357, we cannot conclude that the prosecutor's single reference to Instruction 357 harmed defendant in any way. (See *Chism*, *supra*, 58 Cal.4th at pp. 1298–1299; *Guiton*, *supra*, 4 Cal.4th at pp. 1129–1130.)

Defendant also argues that Instruction 357 violated her due process rights. Specifically, defendant contends that Instruction 357 reduced the prosecution's burden of proving intent by allowing the jury to use defendant's adoptive admission as evidence of intent, even though she denied the literal truth of the statement. For several reasons, we disagree. First, as explained above, Instruction 200 and the terms of Instruction 357 itself directed the jury not to consider the Statement or treat the Statement as an adoptive admission because the predicate facts necessary for an adoptive admission were not established. There is no indication that the jury failed to follow these instructions.

Second, Instruction 357 addressed only adoptive admissions; it did not purport to address admissions by a party or the elements of, or burdens applicable to, murder or the lying-in-wait special circumstance. As such, Instruction 357 did not expressly alter any burdens, nor did it authorize the jury to make conclusions that could not otherwise be made from properly viewing the Statement as an admission of a party. Third, by permitting, but not requiring, the jury to conclude that the defendant adopted a statement if four requirements were met, Instruction 357 created a permissive inference. Permissive inferences do not violate a defendant's due process right where the inference permitted is not irrational. (*Francis v. Franklin* (1985) 471 U.S. 307, 314–315; *People v. Goldsmith* (2014) 59 Cal.4th 258, 270.) Since the permissive inference of Instruction 357 is rational, Instruction 357 did not violate defendant's due process rights. Finally, we disagree that defendant denied the literal truth of the Statement. Defendant admitted to the detectives that she had said the Statement, but then explained it was irrelevant because Randy's dog caused the shotgun to accidentally discharge. Saying that the Statement is irrelevant because of external factors that are wholly unrelated to the Statement is neither a denial of the fact that the Statement was made nor a denial as to what may or may not have been meant by the Statement. For these reasons, Instruction 357 did not reduce the prosecution's burden. (*Francis*, at pp. 314–315; *Goldsmith*, at p. 270; *Chism*, *supra*, 58 Cal.4th at pp. 1298–1299 [finding no harm and that the prosecution's burden was not unconstitutionally lowered by giving the jury an unsupported adoptive admission instruction].)

In sum, we conclude that the record does not show that Instruction 357 lowered the prosecution's burden or affirmatively show a reasonable probability that defendant was convicted solely because of Instruction 357; thus, defendant has not established prejudice. (*Chism*, *supra*, 58 Cal.4th at pp. 1298–1299; *Guiton*, *supra*, 4 Cal.4th at pp. 1129–1130.)

## II. SUFFICIENCY OF THE EVIDENCE FOR LYING IN WAIT

### A. Parties' Arguments

Defendant argues that her due process rights were violated when the jury found true the lying-in-wait special circumstance because substantial evidence did not support two necessary elements: That she concealed her purpose and that she waited and watched for a substantial period before shooting Randy. Defendant argues the evidence shows that Randy was not expected back until about 10:00 p.m., that there was no evidence she ever anticipated him home sooner, and she heard and saw nothing and was unaware that Randy had come home early. Defendant also argues that because Randy was shot from a close range when he walked through the door, there is no way that her purpose could have been concealed. Because substantial evidence does not support the lying-in-wait special circumstance, defendant argues her LWOP sentence must be stricken.

The People argue substantial evidence supports the jury's true finding. The People argue that Larry's testimony, defendant's statements to Rhonda, and the other circumstances of the murder constitute substantial evidence that defendant concealed her purpose from Randy and watched and waited for a substantial period before she shot him.

### B. Legal Standards

#### 1. Sufficiency of the Evidence

Appellate courts analyze challenges to the sufficiency of the evidence to support a special circumstance finding under the same standards applicable to challenges to the sufficiency of the evidence to support a verdict. (*People v. Barrett* (2025) 17 Cal.5th 897, 966.) "The whole record is reviewed 'in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find [the special circumstance allegation true] beyond a reasonable doubt.' " (*Boyce*, *supra*, 59 Cal.4th at p. 691.) " 'Substantial evidence includes circumstantial evidence and any

27.

reasonable inferences drawn from that evidence.' " (*People v. Brooks* (2017) 3 Cal.5th 1, 57.) Appellate courts presume in support of the judgment every fact that the trier of fact could reasonably deduce from the evidence. (*People v. Oyler* (2025) 17 Cal.5th 756, 820 (*Oyler*).) Appellate courts do not resolve credibility issues or evidentiary conflicts. (*People v. Jackson* (2014) 58 Cal.4th 724, 749.) A judgment will not be reversed for insufficiency of the evidence merely because the circumstances may also be reasonably reconciled with a conclusion contrary to the judgment. (*Oyler*, at p. 820.)

## 2. Lying-In-Wait Special Circumstance

If a defendant is found guilty of first degree murder, the defendant will be sentenced to death or to LWOP if the jury also finds true the special circumstance that the "defendant intentionally killed the victim by means of lying in wait." (§ 190.2, subd. (a)(15).) The lying-in-wait special circumstance requires an intentional killing by the defendant under circumstances that include: (1) concealment of purpose from the victim; (2) a substantial period of watching and waiting for the opportune time to act; and (3) a surprise attack on an unsuspecting victim from a position of advantage. (See *People v. Parker* (2022) 13 Cal.5th 1, 58, 60; *People v. Flinner* (2020) 10 Cal.5th 686, 748.) The element of concealment refers to a defendant's actions concealing her true intent or purpose from a victim; it does not require the defendant to be physically concealed from the victim's view just before the attack. (*People v. Mataele* (2022) 13 Cal.5th 372, 421; see also *Parker*, at p. 60.) Further, the watching and waiting requirement does not require a particular length of time if the duration is sufficient to show premeditation or deliberation; the requirement is meant to distinguish cases in which a defendant acts insidiously from cases in which a defendant acts out of rash impulse. (*Flinner*, at p. 749.) Concealing a murderous intent and striking from a position of advantage and surprise are the hallmarks of lying in wait. (*People v. Suarez* (2020) 10 Cal.5th 116, 171.)

## C. Analysis

### 1. Concealed Purpose

Our Supreme Court has observed that the element of concealment makes lying in wait more blameworthy than other forms of murder because "concealment of purpose inhibits detection, defeats self-defense, and may betray at least some level of trust …." (*People v. Stevens* (2007) 41 Cal.4th 182, 204.) Viewing the evidence in the light most favorable to the verdict (*Boyce*, *supra*, 59 Cal.4th at p. 691), and making all reasonable inferences in the verdict's favor (*Oyler*, *supra*, 17 Cal.5th at p. 820), the evidence in this case coincides with our Supreme Court's observation.

Defendant's testimony, the security videos, the absence of any indication of a struggle, the close proximity of the shooting, and the location of Randy's body in the front door entrance all demonstrate that Randy was shot shortly after entering his home. Additionally, it is reasonable to infer that the jury found that defendant concealed her presence from Randy until he entered the house. Although Randy knew that defendant, his wife, would be inside their shared home, there is no indication that Randy could see defendant in the house, knew exactly where defendant was located inside the house, or knew exactly what defendant was doing inside the house. It is reasonable to infer that the jury saw no evidence (such as extra caution getting out of the truck and entering the home) to suggest Randy knew defendant was near the front door with a shotgun waiting to kill him. Given that they were supposed to go to Gridley the next day, the jury could have inferred that Randy assumed that defendant was merely inside packing for the trip. Rhonda's testimony indicates that defendant had a plan and intended to kill Randy when he returned to the house. Rhonda testified that defendant was mad at Randy, defendant told her she would kill Randy and herself before a breakup would occur, and in a threatening and unsettling way, told her that she better say goodbye to Randy soon. When defendant spoke to Randy on the morning of March 6 about when he would be home, it is highly unlikely that she disclosed an illegal purpose to him during the call.

We conclude that collectively, this evidence constitutes substantial evidence that defendant both ambushed and concealed her purpose of murder from Randy. (*People v. Moon* (2005) 37 Cal.4th 1, 22–23 (*Moon*) [finding a lying-in-wait special circumstance was supported by substantial evidence where the defendant was known to the victim, entered the victim's home, did not immediately reveal his presence in the home, later revealed himself but did not answer the victim's question about his presence, and then suddenly pushed the victim down the stairs].)

Defendant argues that because Randy was shot from a close distance, defendant's purpose could not have been concealed because she necessarily would have been holding the gun and likely pointing it at Randy as he entered the house. However, defendant overlooks the fact that Randy did not know what defendant was doing or where defendant was located inside the house when he arrived home. Considering Larry's testimony about Randy's fear of being shot by defendant, if Randy had known that defendant was near the front door with a loaded shotgun, he may well have decided not to enter. Defendant's argument also overlooks the timing reflected in the surveillance videos and defendant's testimony. Again, the evidence shows that Randy was shot very shortly after he entered his home. We are aware of no authority that holds a victim's brief awareness that a defendant is about to kill him is sufficient to negate the concealment of purpose element of lying in wait, particularly when the defendant was previously concealed from the victim's view. (Cf. *Moon*, *supra*, 37 Cal.4th at pp. 22–23.) Therefore, that Randy may have perceived for a few seconds that defendant was about to shoot him after he entered his home unawares does not mean the concealment of purpose element was negated.

In sum, substantial evidence supports the jury's finding that defendant concealed her purpose of murder from Randy. (*Moon*, *supra*, 37 Cal.4th at pp. 22–23.)

### 2. Watching and Waiting for a Substantial Period of Time

Viewing the evidence in the light most favorable to the verdict (*Boyce*, *supra*, 59 Cal.4th at p. 691), and making all reasonable inferences in favor of the verdict (*Oyler*,

*supra*, 17 Cal.5th at p. 820), the evidence reflects that Rhonda spoke to defendant on March 6 between 9:00 a.m. and 9:30 a.m.  Again, Rhonda's testimony that defendant said she would kill Randy before a breakup would occur, and that Rhonda should tell her father goodbye soon, together show that defendant had an intent and plan to kill Randy. The jury could reasonably infer based on the evidence that the defendant moved the gun from the garage into the living room, fully loaded the gun, and removed the safety.  In furtherance of her plan to kill him, defendant shot Randy almost as soon as he walked through the front door.  Since Rhonda's conversation with defendant ended between 9:00 a.m. and 9:30 a.m., and Randy was shot at 1:10 p.m., defendant waited at least three to four hours to shoot Randy.  The evidence shows that defendant waited several hours and then shot Randy just as he was walking in the front door.  There is no set time that must be met for the watching and waiting element of the lying-in-wait special circumstance.  (*Flinner*, *supra*, 10 Cal.5th at p. 749.)  All that is required is that the defendant must have considered her actions and not acted in a rash manner.  (*Ibid*.) Because a matter of mere minutes may suffice (*Moon*, *supra*, 37 Cal.4th at p. 23), we are satisfied that defendant's watching and waiting between three and four hours is more than sufficient to meet the watching and waiting element of lying in wait.  (*Ibid*.; see also *People v. Byrd* (1954) 42 Cal.2d 200, 209 [defendant waited outside his wife's house for four hours].)

Defendant argues she testified that she did not hear Randy pull up to the house, did not hear him walk into the house, and did not think that he would be home until around 10:00 p.m.  Defendant argues that no evidence contradicted this testimony.  However, the jury was not required to credit defendant's exculpatory testimony (*People v. Wader* (1993) 5 Cal.4th 610, 641; *People v. Byrd*, *supra*, 42 Cal.2d at pp. 208–209), even if some of her testimony may have been uncontradicted.  (*People v. Gerson* (2022) 80 Cal.App.5th 1067, 1080).  Moreover, defendant testified that she spoke to Randy on his cellphone sometime in the morning of March 6 to see when he would be coming home.

Given the purpose of the morning cellphone call, that defendant had a loaded shotgun, and how quickly Randy was shot after he walked into the home, the jury could have reasonably inferred that defendant knew through the cellphone call that Randy would be returning home around 1:00 p.m.  Also, considering how quickly Randy was shot after he entered the home, the jury could have reasonably inferred that defendant heard Randy's vehicle, heard Randy unlocking the gate chain, and/or saw Randy pull up in his SUV through a window or between curtains/blinds and thus, knew when he was about to walk through the door.  Therefore, defendant's exculpatory testimony or exculpatory theories do not negate the sufficiency of the jury's finding on the watching and waiting element of lying in wait.  (*Oyler*, *supra*, 17 Cal.5th at p. 820.)

In sum, substantial evidence supports the jury's finding that defendant watched and waited for a substantial period before she shot Randy.  (*Moon*, *supra*, 37 Cal.4th at pp. 22–23.)

## III.    PAROLE REVOCATION FINE

The parties agree that, if defendant's murder conviction and lying-in-wait special circumstance finding are upheld, the $10,000 parole revocation fine under section 1202.45 is an unauthorized sentence that must be stricken.  We agree with the parties.

"A parole revocation fine may not be imposed for a term of [LWOP], as the statute is expressly inapplicable where there is no period of parole."  (*People v. Jenkins* (2006) 140 Cal.App.4th 805, 819.)  Moreover, our Supreme Court recently recognized that the parole revocation fine statute does not apply where a defendant is given both an LWOP sentence and an indeterminate term.  (*People v. Alvarez* (2025) 18 Cal.5th 387, 485–486.)  Because we have upheld both defendant's conviction for murder and the jury's finding on

the lying-in-wait special circumstance,[7] the $10,000 parole revocation fine must be stricken as unauthorized.  (*Alvarez*, at p. 486; *Jenkins*, at p. 819.)

## DISPOSITION

Defendant's $10,000 parole revocation fine under section 1202.45 is stricken.  The judgment is otherwise affirmed.  Because the parole revocation fine has been stricken, the Clerk of the Superior Court shall issue a corrected abstract of judgment that omits the parole revocation fine.

GUERRA, J.[*]

WE CONCUR:

HILL, P. J.

LEVY, J.

---

[7]     Defendant's 10-year stayed term for personal use of a firearm cannot serve as the basis of a parole revocation fine.  (*People v. Montelongo* (2020) 55 Cal.App.5th 1016, 1035.)

[*]     Judge of the Fresno Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.